**PROVIDENT NATIONAL BANK,**
co-trustee of four trusts u/a
dated June 16, 1971

v.

**UNITED STATES of America.**

Civ. A. No. 79–1515.

United States District Court,
E. D. Pennsylvania.

Jan. 29, 1981.

---

Arthur Makadon, Philadelphia, Pa., for plaintiff.

Thea Duell, Asst. U. S. Atty., Philadelphia, Pa., Patricia A. Scott, U. S. Dept. of Justice, Trial Atty., Tax Div., Washington, D. C., for defendant.

## MEMORANDUM OF DECISION

McGLYNN, District Judge.

This action was brought by the plaintiff as co-trustee of four trusts to contest the denials of claims of the trusts for refund of income taxes. Presently before the court are motions for summary judgment by plaintiff and defendant. Under Fed.R. Civ.P. 56(c) summary judgment is appropriate if the record shows that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law. For the following reasons, summary judgment will be granted in favor of the defendant. The following are the facts as developed from documents, pleadings, and affidavits.

Plaintiff, Provident National Bank, is the co-trustee of four trusts created on June 16, 1971 by the late George D. Widener for his

four stepdaughters. The day after the trust was created, Widener transferred equal amounts of publicly traded stock in five corporations, including Gulf Oil Corporation and IBM, to each of the trusts. Widener reported the transfers as gifts and paid gift taxes thereon.

Sometime in August, 1972, each of the four taxpayer-trusts sold the same amounts of Gulf Oil and IBM stocks. Under section 1015 of the Internal Revenue Code, 26 U.S.C. § 1015, the basis of the stocks was calculated by using the same basis as the stocks had in the hands of the donor and increasing it by the gift tax paid. Thus, when each of the taxpayer-trusts sold 1,037 shares of Gulf Oil and 325 shares of IBM stock, the capital gain thereon was determined as follows:

| Securities Sold | | Sale Price | Basis | Long-Term Capital Gain |
|---|---|---|---|---|
| Gulf Oil | 1037 shares | $ 23,232.28 | $18,727.62 | $ 4,504.66 |
| IBM | 325 shares | $135,262.29 | $49,966.04 | $85,296.25 |

The taxpayer-trusts reported the gain on their returns for the fiscal year ended February 28, 1973 and paid the tax thereon.

Widener died on December 8, 1971. In the federal estate tax return for the estate, the executor disclosed the taxpayer-trusts and took the position that the 1971 trust securities were not includable in Widener's estate. On March 31, 1975, the Internal Revenue Service (IRS) sent the Widener estate a letter advising it, among other things, that because the IRS considered the transfers of the 1971 trust securities to be gifts in contemplation of death, their date of death value was to be wholly included in Widener's estate for estate tax purposes. If the stocks were includable in the Widener estate, then their basis would be determined under section 1014 of the Internal Revenue Code. Section 1014 provides that the basis of the property in the hands of one acquiring property from a decedent shall be the fair market value of the property at the date of the decedent's death. Subsequent to the March 31 letter, the IRS mailed a statutory notice of deficiency to the estate.

On November 21, 1975, the Widener estate petitioned the tax court for relief. The Widener estate and the Commissioner of the IRS entered into a settlement of all issues in the deficiency notice on November 17, 1976. On November 19, 1976, the tax court entered a stipulated decision based on the settlement agreement reflecting the final estate tax deficiency. The settlement provided that one-half of the value of the 1971 trust securities would be included in the gross estate for purposes of computing the estate tax.

In addition to the settlement, the executors of the Widener estate and the trustees of the trusts entered into a collateral agreement. The collateral agreement sets forth the understanding reached by the parties as to the effect of the settlement of the estate taxes on the basis of the 1971 trust securities. It provides that each share of the 1971 trust securities shall have a basis consisting of fifty percent of the fair market value of each share as determined under section 1014 for federal estate tax purposes plus fifty percent of the basis determined under section 1015, the donor's basis increased by the gift tax paid thereon.

The basis of the 1971 trust securities provided for in the collateral agreement sets forth a higher basis than that used by the taxpayer-trusts in determining the gain reported from the sale of stock in August of 1972. More specifically, the effect of the collateral agreement was to step-up the basis of the stock that has been sold in 1972 in the following manner:

| | Basis As Used On 1973 Return For Reporting Long-Term Capital Gains | Basis Per Original Contention of Service in 1975 | Basis as Finally Determined By the Stipulated Decision and Collateral Agreement in November 1976 |
|---|---|---|---|
| Gulf Oil | $18,727.62 | $ 27,610.13 | $23,165.47 |
| IBM | $49,966.04 | $102,496.87 | 76,270.86 |

On June 4, 1977, plaintiff filed claims for refund on income taxes on behalf of the four taxpayer-trusts using the basis of the stock as set forth in the collateral agreement for determining the gain from the sale of stock in August of 1972. These

claims for refund were disallowed as barred by the statute of limitations.[1]

Plaintiff seeks relief from the ruling under three alternate theories: (1) sections 1311 through 1314 of the Internal Revenue Code apply to mitigate the effect of the statute of limitations, (2) the statute of limitations cannot begin to run until the taxpayer's cause of action for the refusal accrues, and (3) the collateral agreement does not reflect the true intent of the parties and therefore must be reformed.

■ The mitigation provisions of the Internal Revenue Code of 1954 (sections 1311 through 1314) are designed to grant relief for the erroneous treatment of tax matters when because of the operation of a law, such as the statute of limitations in section 6514, such a correction would be barred. *Kappel's Estate v. C.I.R.*, 615 F.2d 91 (3rd Cir. 1980). However, this relief is limited to defined circumstances. The statute "does not purport to permit the correction of all errors and inequities." *Brennen v. Commissioner*, 20 T.C. 495, 500 (1953). Section 1311(a) reads as follows:

General rule

If a determination (as defined in section 1313) is described in one or more of the paragraphs of section 1312 and, on the date of the determination, correction of the effect of the error referred to in the applicable paragraph of section 1312 is prevented by the operation of any law or rule of law, other than this part and other than section 7122 (relating to compromises), then the effect of the error shall be corrected by an adjustment made in the amount and in the manner specified in section 1314.

Thus, to obtain the benefits of these provisions there must be a determination under section 1313 that is described in one or more of the seven circumstances set forth in section 1312.

Plaintiff contends that there was a determination as defined in section 1313(a)(1) when the tax court issued the stipulated decision and the collateral agreement was signed by the related parties. That section defines "determination" to include:

"... a decision by the Tax Court or a judgment decree, or other order by any court of competent jurisdiction, which has become final;"

Defendant contends that because there has been no "determination" within the meaning of section 1313, plaintiff's case cannot qualify under the mitigation provisions. Defendant's argument has three prongs: (1) the mitigation provisions apply to income tax determinations only, not to estate tax determinations, (2) the stipulated decision of the Tax Court in this matter was a determination of estate taxes, and (3) the collateral agreement is merely an informal agreement concerning the basis of the stock and cannot qualify as a "determination" under section 1313.

■ The mitigation provisions, as they exist today, are essentially the re-enactment in 1939, and then in 1954, of section 820 of the Internal Revenue Act of 1938.[2] Section 820 was an attempt to do equity in the tax area and permit correction of errors in otherwise barred years. The legislative history of section 820 indicates that the mitigation provisions were to be applied specifically to income tax determinations.

In 1938, the Subcommittee on Internal Revenue Taxation of the House Committee on Ways and Means stated:

Your subcommittee has considered the problems and abuses which arise in the administration of the tax laws as a result of the operation and effect of the statute of limitations. Much litigation under the revenue acts deals with the proper year in which *income and deductions* belong.

1. Section 6511 of the Internal Revenue Code, 26 U.S.C. § 6511, states that claims for refund shall be filed within 3 years of the time the return is filed or within 2 years of the time the tax was paid. Section 6514 bars claims for refund not timely filed. The taxpayer-trusts

filed the returns for the period in question with remittance on June 15, 1973. Thus, the statute of limitations expired on June 15, 1976.

2. Section 820 appears as section 3801 of the 1939 Internal Revenue Code.

In none of these cases is there any doubt about the taxability or deductability of the items involved. The Commissioner asserts that an item of *income* should be included in *gross income* for a particular year; the taxpayer contends that it should be taxed in a different year—both agree that the item is properly a part of *gross income.*

Your subcommittee believes that legislation to eliminate the inequities and injustices arising from the operation of the statute of limitations which have been described would be desirable. Report of the Subcommittee on Ways and Means on a Proposed Revision of the Revenue Laws, H.Rep.No.79, 75th Cong., 3rd Sess., pp. 54–55. (emphasis added).

The amendments to section 820 by the Senate Finance Committee Report also support the proposition that the mitigation provisions were intended to be limited to income tax matters.

This section of the bill provides an equitable solution of certain classes of *income-tax problems,* now very numerous, which have caused much hardship to taxpayers and great difficulty to the Commissioner, the Board of Tax Appeals, and the Courts. Finance Committee Report S.Rep.No.1567, 75th Cong., 3rd Sess. p. 48 (emphasis added.)

The Conference Report, which adopted many of the Senate amendments, made specific reference to the mitigation provisions applying to income tax determinations only.

This amendment provides for mitigation of some of the inequities under the *income-tax* laws caused by the statute of limitations and other provisions which now prevent equitable adjustment of various *income-tax* hardships. There is no comparable provision in the House bill. Under the *income-tax,* laws it is possible for a taxpayer or the Commissioner, after

operation of the statute of limitations or some other provision of the internal-revenue laws prevents correction of an error, to obtain a double advantage by taking a position contradictory to that which caused the error. The Senate amendment was drawn to discourage this practice in specific types of cases by authorizing corrective adjustment.

The Senate amendment would work as follows: It becomes operative if (1) after the effective date of the act, there is a *final "determination" under the income tax laws* which gives authoritative sanction to the inconsistent position presently maintained by the taxpayer or the commissioner and indicates that the previous treatment was erroneous under the applicable provision of the internal revenue laws ... (emphasis added) Conf.Rep.No. 2320, 75th Cong., 3rd Sess., p. 56 (1938).

Furthermore, the regulations under the 1939 Code specifically provide that the determination that created the circumstance requiring adjustment must have been with respect to income taxes.

The determination may be with respect to taxes imposed by chapter 1 and subchapters A, B, and D of chapter 2 of the Internal Revenue Code, by the corresponding provisions of any prior Revenue Acts, or by more than one of such provisions Treas.Reg. § 19.3801(b)–0.[3]

In 1954, the mitigation provisions were re-enacted as 26 U.S.C. §§ 1311–1314 with several changes. *See* H.Rep.No. 1337, 83rd Cong., 2d Sess. (1954) and S.Rep.No. 1622, 83rd Cong., 2d Sess. (1954), U.S.Code Cong. & Admin. News 1954, p. 4434. However none of these changes suggest that Congress intended to extend the application of the mitigation provisions beyond its original limitation to income taxes.[4]

With the exception of the updated reference to Subtitle A of the 1954 Code, the

---

3. Chapter 1 of the 1939 Code is entitled "Income Tax," and chapter 2 is entitled "Additional Income Taxes."

4. In fact some changes reinforced the interpretation that the provisions applied only to determinations of income tax matters, i. e., in the

1939 Code the mitigation provisions were under Subtitle D Chapter 38, the Miscellaneous Provisions, but in the 1954 Code the provisions are under Subtitle A entitled "Income Taxes," which contains only income tax provisions.

regulations under the 1954 Code are almost identical to that of the regulations under the 1939 Code.

The determination (including a determination under Section 1313(a)(4) may be with respect to any of the taxes imposed by subtitle A [Income Taxes] of the Internal Revenue Code of 1954, by chapter 1 and subchapters A, B, D, and E, of chapter 2 of the Internal Revenue Code of 1939 or by the corresponding provisions of any prior revenue act, or by more than one of such provisions. Treas.Reg. § 1.1311(a)–2(b) (1960), 26 C.F.R. 1.311(a)–2(b) (1980).

 It is clear that these regulations should be followed unless they contravene the will of Congress. *Fulman v. United States,* 434 U.S. 528, 533, 98 S.Ct. 841, 845, 55 L.Ed.2d 1 (1978); *C.I.R. v. South Texas Lumber Co.,* 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 403 (1948); *Kappel Estate v. C.I.R.,* 615 F.2d 91, 100 (3d Cir. 1980) (Higginbotham, J., dissenting). This regulation not only does not contradict the will of Congress, but rather it is clear in light of the legislative history of the statute that the regulation implements Congressional intent. Under these circumstances a great deal of deference should be given to this authoritative interpretation of the statute. *Kappel Estate v. C.I.R.,* 615 F.2d 91, 100 (3d Cir. 1980) (Higginbotham, J., dissenting).

The only court known to have specifically addressed the issue whether an estate tax determination can qualify as a "determination" within the meaning of section 1313 is the Court of Claims in *Evans Trust v. United States,* 462 F.2d 521 (Ct.Cl.1972). The plaintiff trust in *Evans* had paid capital gains tax on receipt of installments on certain notes in the years 1961, 1962, and 1963. The trust failed to claim deductions for the estate tax attributable to such gains because at that time the notes were not part of the estate, i. e., there was no such deduction available. A 1967 Tax Court determination placed a portion of the notes in the estate for estate tax purposes. Consequently, the plaintiff trust filed for refund for those years relying on sections 1311 through 1314 to overcome the statute of limitations. Although the court gave alternate grounds for its decision, citing section 1311(a)–2(b) of the Treasury Regulations the court did state that a decision in an estate tax matter cannot satisfy the mitigation provisions. *Id.* at 524–25. The court noted that section 1.311(a)–2(b) represented a particularly forceful interpretation because section 6521 of the Internal Revenue Code of 1954 was enacted to allow for the mitigation of the effect of the statute of limitations in cases of related taxes under different chapters. *Id.* fn. 2.

 The legislative history, the applicable Treasury Regulations, and the court's analysis in *Evans* persuades me that the provisions were intended to apply to income tax determinations only. Because the Tax Court decision was a determination of estate taxes, it fails to qualify plaintiff for redress under the mitigation provisions.

 The next issue is whether the collateral agreement itself qualifies as a "determination" under section 1313. The Internal Revenue Manual entitled Closing Agreement Handbook (Handbook) defines a collateral agreement, as used in estate tax cases, as "statements secured from, and signed by or for taxpayers or related parties to clarify, or obtain a commitment relative to some matter other than the amount of assessment or overassessment involved but corollary to the case disposition." *Id.* at ¶ 123. Similarly, the Internal Revenue Manual entitled Appellate Division describes collateral agreements in estate tax cases as useful "if obtained from the parties who receive the assets of the estate since it expresses their understanding of their basis of assets received." *Id.* at ¶ 8842. The collateral agreement is more informal than the closing agreement, which Congress included as a determination under section 1313.[5] The Handbook distinguishes the two in the following manner:

---

5. Section 1313(a)(2) defines determination to include "a closing agreement made under section 7121."

One important distinction between collateral agreements and closing agreements is that the former do not purport to bind the Service. They are one-sided commitments. The Service does not enter into and sign these agreements as a party.... The fact that the taxpayer may not be satisfied with an agreement that does not bind the Government may motivate a request for a closing agreement.

The most significant distinction between collateral agreements and closing agreements is that the former are administrative devices not expressly provided for by the Code while the latter are authorized by IRC 7121.

*Id.* at ¶ 123.

The conspicuous absence of collateral agreements from the list of section 1313 determinations, accompanied by the inclusion of the more formal closing agreements, shows that Congress did not intend collateral agreements to be considered determinations for the purposes of section 1313. Accordingly, I find that the collateral agreement fails to qualify as a determination under section 1313. Therefore, plaintiff cannot use the mitigation provisions to overcome the bar of the statute of limitations.[6] Since there is no genuine issue of material fact germane to plaintiff's claim under the mitigation provisions, defendant's motion for summary judgment on this issue will be granted.

Citing *Reeves v. United States*, 154 F.Supp. 673 (W.D.Pa.1957), plaintiff next argues that the statute of limitations cannot begin to run until the taxpayer's cause of action for the refusal accrues. Since the tax court did not enter its stipulated decision altering the basis of the 1971 trust securities until November 19, 1976, plaintiff contends that the statute of limitations did not begin to run until that date, and thus his claim for refund should be considered timely. In *Reeves*, the court applied the

doctrine of equitable recoupment to allow an estate to obtain the benefit of a deduction for the assessed and collected pre-death income deficiency of the estate.

■ The doctrine of equitable recoupment is a common-law remedy which was designed as a means of avoiding unusually harsh results from adhering strictly to the statute of limitations. The benchmark decision for this doctrine is *Bull v. United States*, 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421 (1935). In that case the government wrongfully collected an estate tax on monies paid to the estate after the decedent's death. Subsequently, the government assessed and collected an income tax on the same money. Thereafter the administratrix filed a timely suit for refund of the income tax, contending that the government should have credited against that tax the amount of the overpayment of the estate tax. The Board of Tax Appeals denied the taxpayer relief. Taxpayer then sued in the court of claims. The court held the income tax was properly collected and the estate tax issue was not reviewable because of the bar of the statute of limitations. But the Supreme Court held that the estate was entitled to recoup from the amount of the income tax lawfully due the amount of the unlawful estate tax, although suit to recover the unlawful tax independently had become barred. The Court stated:

"In a proceeding for the collection of estate tax, the United States through a palpable mistake took more than it was entitled to. Retention of the money was against morality and conscience. But claim for refund or credit was not presented or action instituted for restitution within the period fixed by the statute of limitations. If nothing further had occurred congressional action would have been the sole avenue of redress.

"In July, 1925, the government brought a new proceeding arising out of the same

---

6. Defendant also argues that plaintiff cannot qualify under the mitigation provisions because the circumstances of adjustment do not meet the requirements of section 1312(7) as plaintiff contends. Since we find that there has been no

"determination", as defined in section 1313, that could be described in section 1312, we do not reach the issue whether the circumstances of adjustment are those described in section 1312(7).

transaction involved in the earlier proceeding. This time, however, its claim was for income tax. The taxpayer opposed payment in full, by demanding recoupment of the amount mistakenly collected as estate tax and wrongfully retained. Had the government instituted an action at law, the defense would have been good.... If the claim for income tax deficiency had been the subject of a suit, any counter demand for recoupment of the overpayment of estate tax could have been asserted by way of defense and credit obtained, notwithstanding the statute of limitations had barred an independent suit against the government therefor. This is because recoupment is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded. Such a defense is never barred by the statute of limitations so long as the main action itself is timely."

*Id.* at 260–61, 55 S.Ct. at 699–700.

The decisions following *Bull* have shown a reluctance to extend the doctrine of equitable recoupment beyond facts which parallel that case. *See Rothensis v. Electric Storage Battery Co.,* 329 U.S. 296, 67 S.Ct. 271, 91 L.Ed. 296 (1946); *Stone v. White,* 301 U.S. 532, 57 S.Ct. 851, 81 L.Ed. 1265 (1937). Thus in *Rothensis,* the Court stated that the doctrine "has never been thought to allow one transaction to be offset against another, but only to permit a transaction which is made the subject of a suit by a plaintiff to be examined in all its aspects and judgment to be rendered that does justice in view of the one transaction as a whole." *Id.* 329 U.S. at 299, 67 S.Ct. at 272. The Supreme Court has consistently viewed the doctrine as being essentially a defense in which the offsetting amount from the year barred by the statute of limitations must result from the same transaction that gave rise to the deficiency in the open year.

In *Reeves* the administrator of the deceased's estate paid the principal amount of the estate tax on February 20, 1950 and supplemental amount on July 7, 1952. On November 6, 1952, the government assessed the estate for additional income tax due from the decedent's taxable years 1943 through 1946. Because income tax liabilities of the decedent are a deductible claim against the taxable estate, the assessment of additional income taxes caused the estate taxes to be overpaid. On July 6, 1955, the estate filed a claim for refund of the overpaid estate tax. Although the claim was filed more than three years after the payment of the major part of the estate tax, the court held that the estate was entitled to a full refund of the overpaid tax.

■ *Reeves* is not controlling here. In *Reeves* the offsetting amount in the year barred, i. e., the overpayment of the estate tax in 1950, was the result of the same transaction that gave rise to the deficiency in the open year, i. e., the additional income tax assessed in 1952. So the recoupment of the overpaid estate tax was essentially a defense to the assessment of the additional income tax in 1952. In the present case there is no year against which the taxpayer-trusts can offset the overpayment of their income taxes. Rather, plaintiff seeks a refund of capital gains taxes paid by the taxpayer-trusts on the sale of stock in a barred year because the basis of that stock was stepped-up when portions of it were included in the taxable estate of the settlor of the trusts. Thus two separate taxpayers are involved here, and the teaching of *Bull, Rothensis, Stone* and *Reeves* is that although the doctrine of equitable recoupment is available to overcome the statute of limitations when dealing with refunds and deficiencies of a single taxpayer, it cannot be used to revive a time-barred claim of one taxpayer because of the government's treatment of a related but separate taxpayer. Accordingly, defendant is entitled to summary judgment on this issue as well.

■ Plaintiff's last argument is that the collateral agreement does not reflect the true intent of the parties, and therefore it must be reformed. In essence plaintiff contends that at the time the collateral agreement was executed, the parties mistakenly assumed that either the 1971 trust securities were still held by the taxpayer-trusts or

had been sold in years for which refunds could be timely sought, overlooking the fact that some of these securities had been sold over four years earlier and the gain reported in a year now barred by the statute of limitations. As a result, the step-up in basis contemplated by the collateral agreement was lost for those securities sold in 1972, and the government received a windfall to which it was not entitled. Consequently, plaintiff urges that the collateral agreement should be reformed to permit a further step-up in the basis of the remaining 1971 trust securities in an aggregate amount equal to the aggregate of the lost step-up for the securities sold in 1972.

Defendant disagrees, arguing that although plaintiff may have been mistaken about the effect of the collateral agreement, the government did not intend that the taxpayer-trusts would be able to apply the step-up to the securities sold in 1972. Defendant further argues that since plaintiff is the only party mistaken about the effect of the agreement and since the agreement is clear and unambiguous on its face, it should not be reformed.

The collateral agreement states in relevant part:

> Each of the assets [the 1971 trust securities] comprising the corpora of the June 16, 1971 trusts [the taxpayer-trusts] shall be computed at 50 percent of the fair market value as determined for Federal estate tax purposes, and 50 percent of the value as otherwise determinable under the provisions of the Internal Revenue Code applicable to such shares and $893,-634.40, which represents one half of the Gift Tax paid on the transfer of the assets.

Plaintiff, Provident National Bank, has submitted the affidavit of one of its vice-presidents Paul A. Gerney. Gerney's affidavit states that at the time of the agreement, the parties did not focus on the stocks sold in 1972, and consequently, neither the taxpayer-trusts nor the government intended that the stocks sold in 1972 would not be able to use the step-up in basis. But the affidavit does not point to any evidence from which Gerney or anyone else could infer the government's intentions. To bolster Gerney's conclusory allegations, plaintiff argues that the use of the $893,634.00 figure in the collateral agreement, representing one-half of the gift tax paid on the transfer of all assets to the trusts in 1971, shows that the parties meant the step-up to apply to all the assets transferred in 1971, including those sold in 1972.

On the other hand defendant argues that the collateral agreement was merely intended to set forth the acknowledgment of the related entities as to the effect of the settlement on the basis of the stock[7] and points out that even without the collateral agreement, the basis of the stock would be as set forth in the settlement. Under the terms of the settlement, one-half of the stock was treated as acquired from a decedent and the other half as acquired by gift. Under section 1015(d) of the Internal Revenue Code, the basis of the property acquired by gift shall be increased by one-half of the amount of the gift tax paid. Therefore, the parties were required to increase the basis of one-half of the stock by $893,634.00. Thus, the inclusion of the $893,634.00 figure did not manifest an intention on part of the government to apply the step-up in basis to the stocks sold in 1972. Rather, the agreement was just a statement of the legal effect of the settlement on the basis of the stock, and the sale of some of the stock in 1972 was not material to the agreement.

Furthermore, defendant argues that plaintiff was aware the basis of the trust assets might be affected by an estate tax deficiency as early as March 31, 1975. The statute of limitations expired more than a

---

7. The earlier discussion of the effect of collateral agreements supports defendant's contention that the collateral agreement is used in estate tax cases to express the understanding of the basis of the assets by those who receive the assets. *See* Internal Revenue Manual entitled Appellate Division ؟ 8842. Collateral Agreements are also considered to be one-sided commitments which do not bind the government. *See* Internal Revenue Manual entitled Closing Agreement Handbook ؟ 123.

year later on June 15, 1976. On May 29, 1975, plaintiff, who is also executor of the Widener estate, protested the proposed inclusion of the stocks in the Widener estate.[8] Plaintiff could have addressed the issue or filed a protective claim for refund when it first became aware of the proposed deficiency.

In addition, defendant states that the language is clear and unambiguous on its face and both parties had ample opportunity to review and negotiate the terms of the agreement.[9] Yet, plaintiff never showed any concern about the 1972 sales until it filed its claim for refund on June 8, 1977.

I am not persuaded that plaintiff has presented a factual basis sufficient to raise a genuine issue about the government's intent concerning the effect of the collateral agreement. The inclusion of the $893,-634.00 figure in the collateral agreement is an acknowledgement by the related entities of the legal effect of the settlement on the basis of the stock and does not show an intent on part of the government to apply the step-up in basis to the 1972 sales. The language of the collateral agreement is clear and unambiguous. The affidavit submitted by plaintiff contains conclusory allegations unsubstantiated by any evidence.

In view of these findings, plaintiff's contention that it was mistaken as to the effect of the collateral agreement is irrelevant to defendant's motion for summary judgment. The general rule is that relief will not be granted for a party's unilateral mistake unless the other party knew or should have known of the mistake. *Albano Cleaners, Inc. v. United States*, 455 F.2d 556 (Ct.Cl.1972); *Jansen v. United States*, 344 F.2d 363 (Ct.Cl.1965); *Herman v. Stern*, 419 Pa. 272, 213 A.2d 594 (1965); Restatement of Contracts § 505 (1932); Restatement (Second) of Contracts § 295 (Tentative Draft No. 10, 1975). Plaintiff has not alleged, nor does any evidence show, that defendant knew or should have known

of the possible mistake on plaintiff's part. Therefore, even if plaintiff was mistaken about the effect of the collateral agreement, it is not sufficient grounds to reform the collateral agreement.

For the foregoing reasons, defendant's motion for summary judgment will be granted and plaintiff's motion for summary judgment will be denied.

---

8. *See* plaintiff's letter dated May 29, 1975 attached to defendant's motion.

9. *See* plaintiff's letter dated October 25, 1976, attached to defendant's motion wherein plaintiff makes reference to several changes it made to the collateral agreement.